# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| TIFFANY L. POLLITT, and | ) | |
| BRIAN C. CAMP, SR., individually and | ) | |
| as Administrator of the Estate of BRIAN | ) | |
| C. CAMP, JR. | ) | |
| | ) | |
| *Plaintiffs*, | ) | Civil Action No. 13-82 ERIE |
| | ) | |
| v. | ) | |
| | ) | |
| WEXFORD HEALTH SOURCES, INC., | ) | |
| MOHAMMAD ALI, M.D., | ) | |
| THERESA PATASKI, LPN, | ) | |
| JENNIFER HARR, LPN, | ) | |
| DENISE LAYTON, LPN, | ) | |
| BARBARA CURRIER, RN, | ) | |
| DONALD GRAHAM, CRNP, and | ) | |
| ED POLESKI, LPN | ) | |
| | ) | |
| *Defendants*. | ) | **JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiffs TIFFANY L. POLLITT and BRIAN C. CAMP, SR., individually and as Administrator of the Estate of BRIAN C. CAMP, JR., by their attorneys the Mizner Law Firm, files this Complaint and states:

## Introduction

Baby Brian Camp suffered an unnecessary and needless death because a for-profit corporation that provides the medical services to the Westmoreland County Prison failed in every respect to provide the baby and his mother even the most minimal medical care expected in a civilized society.

After suffering trauma to her abdomen in late July, 2012, Tiffany Pollitt, who was almost

eight months pregnant, suffered vaginal bleeding, severe abdominal pain and cramping. Over a six day period, the prison doctor was called four times, yet he never came to the prison to physically examine Ms. Pollitt. And, he never ordered that Ms. Pollitt be seen by an obstetrician or transported to a medical facility.

During this same six-day period, four licensed practical nurses, a registered nurse and a certified nurse practitioner, each with an independent duty to Baby Brian Camp and his mother, failed in various respects. Some never called the prison doctor, others never called a qualified obstetrician. None of them took the basic necessary and appropriate steps to safeguard Ms. Pollitt and her unborn child.

This lawsuit presents the devastated parents of Baby Brian the only remedy for the egregious wrong that has been thrust upon them, a parent's worst nightmare: the loss of a child.

## A. Parties

1. Plaintiff TIFFANY L. POLLITT is an adult individual who is a resident of Erie County, Pennsylvania. Tiffany L. Pollitt is the mother of Brian C. Camp, Jr., a baby boy who was stillborn on August 9, 2012. Ms. Pollitt is married to Brian C. Camp, Sr.

2. Plaintiff BRIAN C. CAMP, Sr. is an adult individual who is a resident of Erie County, Pennsylvania 16503. Brian C. Camp, Sr. is the father of Brian C. Camp, Jr. and was issued Letters of Administration for the Estate of Brian C. Camp, Jr. by the Register of Wills of Erie County, Pennsylvania on March 18, 2013. Mr. Camp is married to Tiffany Pollitt.

3. Defendant WEXFORD HEALTH SOURCES, INC. ("Wexford Health") is a Florida corporation with a principal place of business at 425 Holiday Drive, Foster Plaza Two, Pittsburgh, Pennsylvania 15220.

4. Defendant Wexford Health advertises itself as "the nation's leading innovative

correctional health care company" which "provides clients with experienced management and technologically advanced services, combined with programs that control costs while ensuring quality" and that "[f]or the past two decades, Wexford Health has consistently delivered proven staffing expertise and a full range of medical, behavioral health, ... and quality management services".

5.     Westmoreland County, Pennsylvania ("Westmoreland County") is a county of the third class organized under the laws of the Commonwealth of Pennsylvania. Westmoreland County has its Main Office at 2 North Main Street, Suite 101, Greensburg, Pennsylvania 15601.

6.     Westmoreland County operates the Westmoreland County Prison ("WCP") which is responsible to maintain custody and control of inmates as mandated by law, including those prisoners held in custody, pending disposition of their respective cases by the courts and those persons already convicted of a criminal act and sentenced to a period of incarceration. As acknowledged on its website, the WCP is responsible for the safe keeping, care and custody of all its inmates.

7.     Westmoreland County has contracted to Wexford Health the responsibility to provide comprehensive health services to the Westmoreland County Prison as set forth in the contract between Westmoreland County and Wexford Health, which states:

> COUNTY hereby engages WEXFORD to provide for the delivery of reasonable and necessary medical, dental, and mental health services, with all related health care personnel and program support services, for the inmate population of the Westmoreland County Prison, and WEXFORD hereby accepts such engagement according to the terms and provisions of this Agreement . . . .

8.     At all times relevant to this Complaint, the conduct of the employees of Wexford Health named in this Complaint, and Wexford Health itself, was so inextricably intertwined with the actions and purposes of Westmoreland County as to render the employees state actors for the purposes of the conduct set forth in this Complaint.

9.      Defendant MOHAMMAD ALI, M.D. is an adult individual who is licensed to practice medicine in the Commonwealth of Pennsylvania. At all times relevant to this Complaint, Defendant Dr. Ali was employed by Wexford Health Sources, Inc. as a medical doctor for the Westmoreland County Prison. Defendant Dr. Ali is sued in his individual capacity. Plaintiffs are asserting a professional liability claim against Defendant Dr. Ali.

10.      Defendant THERESA PATASKI is an adult individual who is a licensed practical nurse in the Commonwealth of Pennsylvania. At all times relevant to this Complaint, Defendant Nurse Pataski was employed by Defendant Wexford Health as a nurse at the Westmoreland County Prison. Defendant Nurse Pataski is sued in her individual capacity. Plaintiffs are asserting a professional liability claim against Defendant Nurse Pataski.

11.      Defendant JENNIFER HARR is an adult individual who is a licensed practical nurse in the Commonwealth of Pennsylvania. At all times relevant to this Complaint, Defendant Nurse Harr was employed by Defendant Wexford Health as a nurse at the Westmoreland County Prison. Defendant Nurse Harr is sued in her individual capacity. Plaintiffs are asserting a professional liability claim against Defendant Nurse Harr.

12.      Defendant DENISE LAYTON is an adult individual who is a licensed practical nurse in the Commonwealth of Pennsylvania. At all times relevant to this Complaint, Defendant Nurse Layton was employed by Defendant Wexford Health as a nurse at the Westmoreland County Prison. Defendant Nurse Layton is sued in her individual capacity. Plaintiffs are asserting a professional liability claim against Defendant Nurse Layton.

13.      Defendant BARBARA CURRIER is an adult individual who is a registered nurse in the Commonwealth of Pennsylvania. At all times relevant to this Complaint, Defendant Nurse Currier was employed by Defendant Wexford Health as a nurse at the Westmoreland County Prison. Defendant Nurse Currier is sued in her individual capacity. Plaintiffs are asserting a

professional liability claim against Defendant Nurse Currier.

14.     Defendant DONALD GRAHAM, CRNP, is an adult individual who is licensed as a Certified Registered Nurse Practitioner in the Commonwealth of Pennsylvania. At all times relevant to this Complaint, Defendant Graham was employed by Wexford Health as a Certified Registered Nurse Practitioner at the Westmoreland County Prison. Defendant Graham is sued in his individual capacity. Plaintiffs are asserting a professional liability claim against Defendant Nurse Graham.

15.     Defendant ED POLESKI, LPN, is an adult individual who is licensed as a Licensed Practical Nurse in the Commonwealth of Pennsylvania. At all times relevant to this Complaint, Defendant Poleski was employed by Wexford Health as a Licensed Practical Nurse at the Westmoreland County Prison. Defendant Nurse Poleski, who is sued in his individual capacity. Plaintiffs are asserting a professional liability claim against Defendant Nurse Poleski.

**B. Jurisdiction and Venue**

16.     This action is being brought under the Civil Rights Act, 42 U.S.C. § 1983 which provides a cause of action for the "deprivation of any rights, privileges, or immunities secured by the Constitution and the laws" of the United States. This Honorable Court has subject matter jurisdiction over this civil rights action pursuant to 28 U.S.C. §§ 1331 and 1343.

17.     This Honorable Court has jurisdiction over the pendent common law negligence claims pursuant to 28 U.S.C. § 1367.

18.     Venue is proper in the Western District of Pennsylvania pursuant to 28 U.S.C. § 1391(a)(2), (a)(3), & (c) because a substantial part of the events or omissions giving rise to this claim occurred in this district and each of the Defendants is subject to personal jurisdiction in this district.

## C. Facts

19.     Ms. Pollitt and Mr. Camp were married on May 19, 2010 in Erie County, Pennsylvania.

20.     In January 2012, Ms. Pollitt became aware that she was pregnant. Ms. Pollitt's pregnancy progressed normally for the first few months.

21.     On May 30, 2012, Ms. Pollitt had a complete obstetric ultrasound performed at McGee Women's Hospital.

22.     Paul D. Speer, M.D. reviewed the images from the ultrasound and estimated that Ms. Pollitt's baby had reached a gestational age of 22 weeks and one day. Dr. Speer found no abnormalities with the baby or his growth or development.

23.     On July 28, 2012, Ms. Pollitt was an inmate in the custody of the WCP in Greensburg, Pennsylvania.

24.     On that day, Ms. Pollitt was in the outside gym at the WCP attempting to exercise with a volleyball.

25.     Ms. Pollitt was confronted by fellow inmates Gabriella Wade and LeAnn Armstrong, who demanded that Ms. Pollitt give them the ball.

26.     While Ms. Pollitt was arguing with Inmate Wade, Inmate Armstrong approached Ms. Pollitt and attempted to take the volleyball out of Ms. Pollitt's hands. While attempting to take the ball out of Ms. Pollitt's hands, Inmate Armstrong hit Ms. Pollitt hard in her abdomen.

27.     Ms. Pollitt confronted Inmate Armstrong concerning the fact that Armstrong had hit Ms. Pollitt in the abdomen while she was pregnant. WCP personnel responded to the commotion, issued a disciplinary report to Ms. Pollitt, and put her in a solitary confinement disciplinary cell.

28.     The next day, July 29th, Ms. Pollitt woke up experiencing uterine cramping, tightness in her lower back, and vaginal spotting.

29.     Ms. Pollitt informed the correctional officer on duty of her condition and asked to speak to a nurse. The officer in question advised her that she could not see the nurse at that time and would have to put in a sick call slip to see medical staff.

30.     Ms. Pollitt repeatedly asked various staff members for a sick call slip all day and all night, but she was repeatedly refused.

31.     On Monday, July 30th,  Ms. Pollitt had a disciplinary board hearing in front of Deputy Warden Eric B. Schwartz, Lieutenant Brad V. Tomasello, and Correctional Officer Dean Naser relating to the disciplinary infraction issued against her on July 28th.

32.     Ms. Pollitt attempted to tell Schwartz, Tomasello, and Naser about being hit in her abdomen, the worrying symptoms that she had been experiencing, and her inability to receive appropriate medical help, but the board members advised her that, because these matters had no bearing on the disciplinary charges against her, her disciplinary hearing was not the proper place to raise those concerns.

33.     Instead, disciplinary board members Schwartz, Tomasello, and Naser found Ms. Pollitt guilty of creating a disturbance or disrupting normal operations and refusing to obey a lawful oral or written order and sentenced her to serve 30 days in "lock-up" also known as solitary confinement.

34.     The next day, July 31th, Ms. Pollitt was transported to Gyno Associates, Inc. for her scheduled, routine prenatal visit with  Dr. Beth Maxwell.

35.     Ms. Pollitt told Dr. Maxwell about the trauma to her abdomen and the symptoms she had experienced. Ms. Pollitt advised that her spotting had subsided but that she was still

experiencing uterine cramping and a feeling of tightness in her lower back.

36.     Dr. Maxwell told Ms. Pollitt that, since her spotting had subsided and there was no bruising, everything should be fine but that she should contact medical staff at the prison if any of the symptoms returned.

37.     Dr. Maxwell checked the fetal heart rate and measured Ms. Pollitt's fundal height.

38.     On Friday, August 3, 2012, between 10 am and 11 am, Ms. Pollitt's symptoms worsened and her vaginal spotting returned.

39.     Ms. Pollitt managed to have the medical department contacted on her behalf, and she was taken to the Westmoreland County Prison's medical unit where she was seen by Defendant Nurse Pataski. Ms. Pollitt informed Defendant Nurse Pataski of the trauma to her abdomen, her symptoms and rated her pain as a 6.

40.     Defendant Nurse Pataski advised Ms. Pollitt to take two Tylenol pills, to lay on her side and instructed her that if her pain became worse to contact a correction officer. Ms. Pollitt was told to return to her cell. Defendant Nurse Pataski did not call Defendant Dr. Ali, Dr. Maxwell or any other qualified obstetrician to discuss Ms. Pollitt's symptoms.

41.     Over the next couple of hours, Ms. Pollitt continue to experience significant abdominal and lower back pain and again asked correction officers to be seen by medical professionals as she had been directed by Dr. Maxwell. Around two o'clock in the afternoon, two medical professionals came to Ms. Pollitt's cell. While at the cell, the nurse attempted to feel for the baby and to listen for his heartbeat with a stethoscope.  When the nurse was unsuccessful in obtaining the baby's heartbeat, Ms. Pollitt was taken by wheelchair to the back room and told that a doctor would see her on Monday.

42.     Ms. Pollitt was frightened, upset, and crying, and she begged to have her baby examined by an obstetrician.  She was afraid because she could not feel any baby movement and

told anyone within hearing distance of her fears. No one would listen. Ms. Pollitt was alone and ignored.

43.     According to Ms. Pollitt's medical records from the Westmoreland County Prison, Defendant Dr. Ali was notified of Ms. Pollitt's "symptoms". He only ordered a urine dip and that Ms. Pollitt's vital signs be monitored.  Defendant Dr. Ali did not come in and examine Ms. Pollitt. Dr. Ali did not order that Ms. Pollitt be seen by an obstetrician.

44.     Ms. Pollitt continued to suffer both physically and mentally as correction officers refused her pleas for help for her unborn child. Ms. Pollitt became so upset that a corrections officer requested that a mental health counselor see Ms. Pollitt.

45.     Around eight o'clock in the evening, a mental health counselor spoke to Ms. Pollitt and wrote in Ms. Pollitt's medical chart that Ms. Pollitt was "upset and crying regarding current housing status, being pregnant" and that Ms. Pollitt appeared to "exaggerate recent events leading to current DC status and medical housing placement" and that she "continued however to exhibit catastrophic thinking patterns and unrealistic expectations regarding disciplinary, custody and medical procedures."

46.     On Saturday, August 4th, several nurses, including Defendant Nurses Jennifer Harr, Theresa Pataski, Denise Layton, and Barbara Currier came to Ms. Pollitt's cell to examine her sometime between 3 pm and 4 pm after she continued to complain about not being able to feel any movement from her baby. Ms. Pollitt repeatedly begged to have her baby examined by an obstetrician.

47.     After contacting Defendant Dr. Ali, the nurses palpated Ms. Pollitt's stomach, as ordered by Dr. Ali, and told her that they could feel the baby move and, therefore, that she would be fine. The nurses then left Ms. Pollitt's cell. Defendant Dr. Ali did not come in and examine Ms. Pollitt.  Dr. Ali did not order that Ms. Pollitt be seen by an obstetrician despite Ms. Pollitt's

repeated requests to see one.

48.     Defendant Nurses Jennifer Harr, Theresa Pataski, Denise Layton, and Barbara Currier did not call Dr. Maxwell or any other qualified obstetrician even though Ms. Pollitt continued to suffer extreme abdominal pain and was unable to detect any fetal movement.

49.     Ms. Pollitt repeatedly begged to have her baby examined by an obstetrician as she had been directed by Dr. Maxwell.  Throughout this ordeal, she was afraid because she could not feel any baby movement and continued in unbearable pain.

50.     After almost two days of crying, screaming and begging for help for her unborn son, on Monday, August 6th, between 1:00 pm and 2:00 pm, Ms. Pollitt was examined by Defendant Certified Registered Nurse Practitioner Donald Graham after not feeling her baby move and experiencing cramping, vaginal spotting, and tightness in her back. Defendant Nurse Practitioner Graham told Ms. Pollitt that he felt the baby kick. Ms. Pollitt again begged to have her baby examined by an obstetrician as she had been directed by Dr. Maxwell.

51.     Defendant Registered Nurse Practitioner Graham told Ms. Pollitt that the spotting, cramping, and tightness in her back occurred because the baby was moving into the birth canal, and that she was not experiencing fetal movement because she had been prescribed, and was taking, methadone. Defendant Nurse Practitioner Graham then sent Ms. Pollitt back to her cell. Defendant Nurse Practitioner Graham did not call Defendant Dr. Ali, Dr. Maxwell or any other qualified obstetrician.

52.     Over the next couple of days, Ms. Pollitt told anyone who would listen that she was in severe pain, that she needed to see an obstetrician, and that she was deathly afraid that something bad was happening to her baby. At her regular blood sugar checks at both 3:30 pm and 8:30 pm, she told another nurse that her obstetric symptoms were worsening. That Nurse advised Ms. Pollitt to put herself on bed rest and neither ordered or performed any other testing or treatment

and did not call Defendant Dr. Ali, Dr. Maxwell or any other qualified obstetrician.

53.      The pain continued to get worse. By 1:00 am the next morning, Thursday, August 9th, Ms. Pollitt could no longer tolerate the pain and repeatedly pushed the emergency call button in her cell.

54.      A corrections officer contacted the medical department, who sent Defendant Nurse Ed Poleski to Ms. Pollitt's cell.

55.      Defendant Nurse Poleski took Ms. Pollitt's vital signs, gave Ms. Pollitt two Tylenol tables, and left. Defendant Nurse Poleski did not call Defendant Dr. Ali,  Dr. Maxwell or any other qualified obstetrician.

56.      Within the hour, Ms. Pollitt again repeatedly pressed the emergency call button in her cell because of her excruciating pain and in an effort to get her baby to a hospital.

57.      The same corrections officer responded, and Ms. Pollitt continued to scream and begged the officer to get her proper medical treatment for the baby at a hospital. The corrections officer again summoned the medical staff to Ms. Pollitt's cell.

58.      This time a medical professional with a first name of  "Mike" responded to the request for medical assistance, took Ms. Pollitt's vital signs, and left.

59.      Ms. Pollitt, fearing for her unborn baby's well-being, asked another corrections officer to speak to a sergeant or lieutenant.

60.      No one responded.

61.      When Ms. Pollitt continued to press her emergency call button, prison staff silenced the emergency button.

62.      Ms. Pollitt continued screaming and begging as loudly as she could to get her baby help. She repeatedly beat her shoe against the door in a desperate attempt to get appropriate

medical care for her unborn baby.

63.     In response, corrections officers told Ms. Pollitt to "grow up," asked her what she expected them to do, and told her "better luck with next shift."

64.     Throughout the night, the pain was so severe that Ms. Pollitt, at times, she could not get off the floor of her cell.

65.     By approximately 6 am, Ms. Pollitt had bled all over the floor and in the commode in her cell. Only then, after a night of crying, screaming and begging for help, and while Ms. Pollitt was in the process of bleeding to death, corrections officers summoned medical staff.

66.     At approximately 6:10 am, Defendant Nurse Poleski again responded to Ms. Pollitt's cell. He observed the blood on the floor of the cell and in the commode and, finally, contacted the prison doctor.

67.     The prison doctor agreed with Ms. Pollitt that she should be sent to a hospital for evaluation, and she departed the Westmoreland County Prison for the Westmoreland Hospital at approximately 6:45 am.

68.     After Ms. Pollitt arrived at the hospital, medical personnel conducted an ultrasound examination to ascertain the baby's condition.

69.     The ultrasound examination revealed that the baby had no heartbeat.

70.     James G. Breisinger, D.O. read the ultrasound and directed the ultrasound team to recheck to see if they could detect a heartbeat.

71.     Another ultrasound examination was conducted, and the ultrasound team confirmed that the baby's heart was not beating.

72.     The ultrasound also showed a significant amount of blood had accumulated behind the placenta. Ms. Pollitt was still bleeding and having significant abdominal pain. Dr. Breisinger noted that Ms. Pollitt was "in a good amount of distress".

73.     Dr. Breisinger ruptured the amniotic sac, or "bag of waters," surrounding the baby and allowed labor to progress naturally.

74.     At 7:44 am, Dr. Maxwell explained to Ms. Pollitt that her baby boy Brian had no heartbeat. Ms. Pollitt's worst nightmare had become a reality, and she began to cry.

75.     For the next several hours, Ms. Pollitt labored in extreme pain to deliver her baby but despite her efforts to do so, she was unable to naturally deliver her baby boy. Throughout the entire process, Ms. Pollitt hemorrhaged large amounts of blood presenting a clear and present danger to Ms. Pollitt.

76.     At approximately 9:40 am, after hemorrhaging significant amounts of blood, Dr. Maxwell determined that there was a need to proceed with a Cesarean section and blood transfusion.

77.     Baby Brian was born at approximately 11 am on August 9, 2012. He was not breathing, and doctors gave him an APGAR score of zero.

78.     Baby Brian was stillborn.

79.     Ms. Pollitt held baby Brian in her arms for the next couple of hours.

80.     Ms. Pollitt suffered a large amount of blood loss and required two units of red blood cells intraoperatively. Her hemoglobin was 7 postoperatively.

81.     The following morning, August 10th, Ms. Pollitt's hemoglobin had dropped to 3 and she was transferred to the intensive care unit. Ms. Pollitt was discharged on August 13, 2012.

82.     The cause of baby Brian C. Camp's death was placental abruption.

83.     The medical care, diagnosis, treatment and services rendered by the defendants were performed in a negligent and careless manner and not in accordance with professional standards required of the conditions presented by Tiffany L. Pollitt and Brian C. Camp, Jr.

84.     As a direct and proximate result of the negligence by Defendants Mohammed Ali,

M.D., Theresa Pataski, LPN, Jennifer Harr, LPN, Denise Layton, LPN, Barbara Currier, RN,

Donald Graham, CRNP, and Ed Poleski, LPN and the deliberate indifference of Defendants

Mohammed Ali, M.D., Theresa Pataski, LPN, Jennifer Harr, LPN, Denise Layton, LPN, Barbara

Currier, RN, Donald Graham, CRNP, and Ed Poleski, LPN to the medical needs of Ms. Pollitt,

Brian C. Camp, Jr. suffered severe injuries causing his untimely death and Ms. Pollitt suffered

personal injuries.

85.     As a direct and proximate result of the negligence by Defendants Mohammed Ali,

M.D., Theresa Pataski, LPN, Jennifer Harr, LPN, Denise Layton, LPN, Barbara Currier, RN,

Donald Graham, CRNP, and Ed Poleski, LPN and the deliberate indifference of Defendants

Mohammed Ali, M.D., Theresa Pataski, LPN, Jennifer Harr, LPN, Denise Layton, LPN, Barbara

Currier, RN, Donald Graham, CRNP, and Ed Poleski, LPN to the medical needs of Ms. Pollitt,

Brian C. Camp, Jr. experienced pain and suffering and loss of life's pleasures.

86.     As a direct and proximate result of the negligence by Defendants Mohammed Ali,

M.D., Theresa Pataski, LPN, Jennifer Harr, LPN, Denise Layton, LPN, Barbara Currier, RN,

Donald Graham, CRNP, and Ed Poleski, LPN and the deliberate indifference of Defendants

Mohammed Ali, M.D., Theresa Pataski, LPN, Jennifer Harr, LPN, Denise Layton, LPN, Barbara

Currier, RN, Donald Graham, CRNP, and Ed Poleski, LPN to the medical needs of Ms. Pollitt,

Tiffany L. Pollitt experienced pain and suffering, inconvenience, mental anguish and upset,

humiliation and embarrassment, and loss of life's pleasures.

87.     Brian C. Camp, Jr. died having as his survivors his mother and father, Tiffany L.

Pollitt and Brian C. Camp, Sr.

88.     Plaintiff Brian C. Camp, Sr. as the Administrator of the Estate of Brian C. Camp,

Jr., deceased, brings this wrongful death action pursuant to the Pennsylvania Wrongful Death Act,

42 Pa.C.S.A. § 8301, seeking all recoverable damages thereunder.

89.     Pursuant to 42 Pa.C.S.A. § 8301(b) the sole beneficiaries entitled to recovery under the Pennsylvania Wrongful Death Act are Plaintiffs Tiffany L. Pollitt and Brian C. Camp, Sr., the decedent's parents.

90.     Brian C. Camp, Jr. did not bring an action for his personal injuries during his lifetime and no other action for the death of Baby Brian has been commenced.

91.     As a direct and proximate result of the negligence, failure to adhere to the standard of care required, and/or other culpable conduct of Defendants Wexford Health Sources, Inc., Mohammed Ali, M.D., Theresa Pataski, LPN, Jennifer Harr, LPN, Denise Layton, LPN, Barbara Currier, RN, Donald Graham, CRNP, and Ed Poleski, LPN, the Plaintiffs are entitled to recover, on behalf of Brian C. Camp, Jr.'s beneficiaries, all damages as are permissible pursuant to the Wrongful Death Act.

92.     Plaintiff, Brian C. Camp, Sr., as the Administrator of the Estate of Brian C. Camp, Jr. brings this Survival Action on behalf of the Estate of Brian C. Camp, Jr., deceased, pursuant to the Pennsylvania Survival Act, 42 Pa.C.S.A. § 8302, seeking all recoverable damages thereunder.

93.     As a direct and proximate result of the negligence, failure to adhere to the standard of care required, and/or other culpable conduct of Defendants Wexford Health Sources, Inc., Mohammed Ali, M.D., Theresa Pataski, LPN, Jennifer Harr, LPN, Denise Layton, LPN, Barbara Currier, RN, Donald Graham, CRNP, and Ed Poleski, LPN, Brian C. Camp, Sr., as the Administrator of the Estate of Brian C. Camp, Jr., deceased, is entitled to recover for Brian C. Camp, Jr.'s untimely death all damages as are permissible pursuant to the Survival Act.

## COUNT I
## VIOLATION OF THE EIGHTH AMENDMENT - DELIBERATE INDIFFERENCE

### Tiffany L. Pollitt

### v.

### Wexford Health Sources, Inc., Mohammed Ali, M.D., Theresa Pataski, LPN, Jennifer Harr, LPN, Denise Layton, LPN, Barbara Currier, RN, Donald Graham, CRNP, and Ed Poleski, LPN

94.     The foregoing averments are incorporated herein by reference as if fully set forth herein.

95.     Ms. Pollitt's pregnancy constituted a serious medical condition.

96.     The vaginal spotting, uterine cramping, and tightness in the lower back that Ms. Pollitt experienced were symptoms of serious complications in Ms. Pollitt's pregnancy that were so obvious a layperson would know they required medical treatment.

97.     Denying or delaying care by a capable medical professional for trauma to Ms. Pollitt's abdomen created a risk of serious physical injury both to Ms. Pollitt and to her unborn baby boy.

98.     Denying or delaying care by a capable medical professional for Ms. Pollitt's vaginal spotting, uterine cramping, and tightness in her lower back created a risk of serious physical injury both to Ms. Pollitt and to her unborn baby boy.

99.     Denying or delaying care by a capable medical professional for Ms. Pollitt's vaginal spotting, uterine cramping, and tightness in her lower back created a risk of needless pain and suffering for both Ms. Pollitt and her unborn baby boy.

100.    Defendants Wexford Health Sources, Inc., Mohammed Ali, M.D., Theresa Pataski, LPN, Jennifer Harr, LPN, Denise Layton, LPN, Barbara Currier, RN, Donald Graham, CRNP, and Ed Poleski, LPN knew or should have known of the serious medical condition from which

Ms. Pollitt were suffering.

101.    Defendants Wexford Health Sources, Inc., Mohammed Ali, M.D., Theresa Pataski, LPN, Jennifer Harr, LPN, Denise Layton, LPN, Barbara Currier, RN, Donald Graham, CRNP, and Ed Poleski, LPN acted with deliberate indifference to the serious medical needs of plaintiff Tiffany L. Pollitt and disregarded an excessive risk of harm to her health and safety.

102.    The risk of serious harm and the necessity of treatment by an obstetrician or other properly trained medical professional to Ms. Pollitt and her unborn baby boy was obvious even to a layperson.

103.    As a direct and proximate result of the deliberate indifference of Defendants Wexford Health Sources, Inc., Mohammed Ali, M.D., Theresa Pataski, LPN, Jennifer Harr, LPN, Denise Layton, LPN, Barbara Currier, RN, Donald Graham, CRNP, and Ed Poleski, LPN, the plaintiffs' decedent and his survivors have experienced and suffered the injuries and damages set forth above.

104.    Defendants Wexford Health Sources, Inc., Mohammed Ali, M.D., Theresa Pataski, LPN, Jennifer Harr, LPN, Denise Layton, LPN, Barbara Currier, RN, Donald Graham, CRNP, and Ed Poleski, LPN, are jointly and severally liable for the harm suffered by plaintiff Tiffany L. Pollitt.

WHEREFORE, Plaintiff Tiffany L. Pollitt, requests that this Honorable Court enter judgment in her favor and against Defendants Wexford Health Sources, Inc., Mohammed Ali, M.D., Theresa Pataski, LPN, Jennifer Harr, LPN, Denise Layton, LPN, Barbara Currier, RN, Donald Graham, CRNP, and Ed Poleski, LPN, in excess of seventy-five thousand dollars ($75,000.00), along with such other relief as this Honorable Court may deem appropriate or just.

## COUNT II
## WRONGFUL DEATH ACTION

**Tiffany L. Pollitt and Brian C. Camp, Sr.**

**v.**

**Wexford Health Sources, Inc., Mohammed Ali, M.D., Theresa Pataski, LPN, Jennifer Harr, LPN, Denise Layton, LPN, Barbara Currier, RN, Donald Graham, CRNP, and Ed Poleski, LPN**

105.     The foregoing averments are incorporated herein by reference as if fully set forth herein.

106.     Defendants Mohammed Ali, M.D., Theresa Pataski, LPN, Jennifer Harr, LPN, Denise Layton, LPN, Barbara Currier, RN, Donald Graham, CRNP, and Ed Poleski, LPN were negligent, including but not limited to, in the following respects directly, accumulatively and/or alternatively:

        a.     Failing to order fetal or uterine monitoring and/or ensure that fetal or uterine monitoring occurred to evaluate the wellbeing of Baby Brian as well as to identify placental abruption and preterm labor;

        b.     Failing to ensure that Ms. Pollitt and her unborn child were transported to a facility that would provide appropriate and necessary obstetrical care;

        c.     Failing to appropriately and adequately monitor Ms. Pollitt and her unborn child;

        d.     Failing to properly take necessary and appropriate steps to safeguard Ms. Pollitt and her unborn child;

        e.     Failing to possess and/or exercise adequate medical skills, knowledge, experience and techniques for the proper treatment of Ms. Pollitt and her unborn child; and

        f.     Failing to properly conform to accepted standards of medical practice and

care in the diagnosis, treatment and medical management of Ms. Pollitt and her unborn child.

107.    As a direct and proximate result of the negligent conduct of Defendants Mohammed Ali, M.D., Theresa Pataski, LPN, Jennifer Harr, LPN, Denise Layton, LPN, Barbara Currier, RN, Donald Graham, CRNP, and Ed Poleski, LPN, baby Brian C. Camp, Jr. and his survivors have experienced and suffered the injuries and damages set forth above.

108.    Defendant Wexford Health Sources, Inc. is vicariously liable for the acts of its employees, agents and/or servants Defendants Mohammed Ali, M.D., Theresa Pataski, LPN, Jennifer Harr, LPN, Denise Layton, LPN, Barbara Currier, RN, Donald Graham, CRNP, and Ed Poleski, LPN.

WHEREFORE, Plaintiffs TIFFANY L. POLLITT and BRIAN C. CAMP, SR. request that this Honorable Court enter judgment in her favor and against Defendants Wexford Health Sources, Inc., Mohammed Ali, M.D., Theresa Pataski, LPN, Jennifer Harr, LPN, Denise Layton, LPN, Barbara Currier, RN, Donald Graham, CRNP, and Ed Poleski, LPN, in excess of seventy-five thousand dollars ($75,000.00), along with such other relief as this Honorable Court may deem appropriate or just.

[CONTINUED ON NEXT PAGE]

## COUNT III
## SURVIVAL ACTION

**Brian C. Camp, Sr., Administrator of the Estate of Brian C. Camp, Jr.**

**v.**

**Wexford Health Sources, Inc., Mohammed Ali, M.D., Theresa Pataski, LPN,
Jennifer Harr, LPN, Denise Layton, LPN, Barbara Currier, RN, Donald Graham, CRNP,
and Ed Poleski, LPN**

109.    The foregoing averments are incorporated herein by reference as if fully set forth

herein.

110.    Defendants  Mohammed Ali, M.D., Theresa Pataski, LPN, Jennifer Harr, LPN,

Denise Layton, LPN, Barbara Currier, RN, Donald Graham, CRNP, and Ed Poleski, LPN were

negligent, including but not limited to, in the following respects directly, accumulatively and/or

alternatively:

    a.    Failing to order fetal or uterine monitoring and/or ensure that fetal or uterine

monitoring occurred to evaluate the wellbeing of Baby Brian as well as to identify placental

abruption and preterm labor;

    b.    Failing to ensure that Ms. Pollitt and her unborn child were transported to a

facility that would provide appropriate and necessary obstetrical care;

    c.    Failing to appropriately and adequately monitor Ms. Pollitt and her unborn

child;

    d.    Failing to properly take necessary and appropriate steps to safeguard Ms.

Pollitt and her unborn child;

    e.    Failing to possess and/or exercise adequate medical skills, knowledge,

experience and techniques for the proper treatment of Ms. Pollitt and her unborn child; and

    f.    Failing to properly conform to accepted standards of medical practice and

care in the diagnosis, treatment and medical management of Ms. Pollitt and her unborn child.

111.    As a direct and proximate result of the negligent conduct of Defendants Mohammed Ali, M.D., Theresa Pataski, LPN, Jennifer Harr, LPN, Denise Layton, LPN, Barbara Currier, RN, Donald Graham, CRNP, and Ed Poleski, LPN, baby Brian C. Camp, Jr. and his survivors have experienced and suffered the injuries and damages set forth above.

112.    Defendant Wexford Health Sources, Inc. is vicariously liable for the acts of its employees, agents and/or servants Defendants Mohammed Ali, M.D., Theresa Pataski, LPN, Jennifer Harr, LPN, Denise Layton, LPN, Barbara Currier, RN, Donald Graham, CRNP, and Ed Poleski, LPN.

WHEREFORE, Plaintiff BRIAN C. CAMP, SR., Administrator of the Estate of BRIAN C. CAMP, JR., deceased, requests that this Honorable Court enter judgment in her favor and against Defendants Wexford Health Sources, Inc., Mohammed Ali, M.D., Theresa Pataski, LPN, Jennifer Harr, LPN, Denise Layton, LPN, Barbara Currier, RN, Donald Graham, CRNP, and Ed Poleski, LPN, in excess of seventy-five thousand dollars ($75,000.00), along with such other relief as this Honorable Court may deem appropriate or just.

[CONTINUED ON NEXT PAGE]

**JURY TRIAL DEMANDED**

Respectfully submitted,

MIZNER LAW FIRM

By: /s/ John F. Mizner

John F. Mizner
PA Bar No. 53323
jfm@miznerfirm.com

Joseph M. Kanfer
PA Bar No. 306558
jmk@miznerfirm.com

201 German Street
Erie, Pennsylvania 16507
814.454.3889

*Attorneys for the Plaintiffs*