**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| TIFFANY L. POLLITT, and | ) | |
| BRIAN C. CAMP, SR., individually and | ) | |
| as Administrator of the Estate of BRIAN | ) | |
| C. CAMP, JR. | ) | |
| | ) | |
| *Plaintiffs,* | ) | Civil Action No. 1:13-cv-00082 |
| | ) | |
| v. | ) | |
| | ) | |
| WEXFORD HEALTH SOURCES, INC., | ) | Hon. Terrence F. McVerry |
| MOHAMMAD ALI, M.D., | ) | United States District Judge |
| THERESA PATASKI, LPN, | ) | |
| JENNIFER HARR, LPN, | ) | |
| DENISE LAYTON, LPN, | ) | |
| BARBARA CURRIER, RN, | ) | |
| DONALD GRAHAM, CRNP, and | ) | |
| ED  POLESKI, LPN | ) | |
| | ) | |
| *Defendants.* | ) | **JURY TRIAL DEMANDED** |

**MOTION TO COMPEL ADHERENCE TO FED. R. CIV. P. 30, TO ALLOW
RE-DEPOSITIONS TO CURE IMPROPER DEPOSITION CONDUCT, AND FOR
SANCTIONS**

Plaintiffs TIFFANY L. POLLITT, and BRIAN C. CAMP, SR., individually and as

Administrator of the Estate of BRIAN C. CAMP, JR., by their attorneys the Mizner Law Firm,

file this Motion to Compel Adherence to Fed. R. Civ. P. 30, to Allow Re-Depositions to Cure

Improper Deposition Conduct, and for Sanctions and state:

**A. Introduction**

1.      As this Honorable Court is aware, Plaintiffs have had difficulty scheduling

depositions in this matter and, as a result of these difficulties, Plaintiffs filed a Motion to Compel

Depositions and Responses to Written Discovery. (Doc. 46).

2.      After filing their Motion to Compel, Plaintiffs scheduled and duly noticed the deposition of Defendant Poleski; however, because he apparently "believed the deposition had been canceled because he had not received directions to the office for it," (Doc. 61 at 2), Defendant Poleski did not appear for his deposition.

3.      Plaintiffs subsequently filed a Motion for Sanctions arising out of Defendant Poleski's failure to appear for his deposition, (Doc. 56).

4.      On September 29, 2014, this Honorable Court entered a Memorandum Order addressing the Plaintiffs' concerns and setting forth a fair and equitable procedure for ensuring that discovery could be concluded in a smooth and efficient manner. (Doc. 55).

5.      This Honorable Court subsequently found that Defendant Poleski's conduct was contemptuous, but held took under advisement the issue of an appropriate sanction for Defendant Poleski's conduct. (Doc. 65).

6.      In the wake of this Honorable Court's recent Memorandum Orders governing the discovery process in this case, Plaintiffs have been able to schedule and take the depositions of Defendants Graham and Poleski as well as Wexford employees Lisa DeMiere and Mark Dalesandro.

7.      However, despite the fact that each of these four (4) depositions has occurred, Plaintiffs have encountered further difficulties in actually conducting the depositions.

8.      Plaintiffs are therefore reluctantly petitioning this Honorable Court yet again to intervene in the discovery process and require the Defendants[1] to conform their conduct to the

---

[1] Defendant Currier is now represented by separate counsel from the other Defendants. While Plaintiffs refer to "Defendants" as a group throughout this Motion, Defendant Currier's new, separate counsel was not involved in any of the conduct which is the subject of this Motion, and "counsel for Defendants" refers to counsel for the Defendants other than Ms. Currier.

Federal Rules of Civil Procedure so as to allow an orderly conclusion to the discovery process.

9. Throughout the depositions of Defendants Graham and Poleski and Ms. DeMiere, counsel for Plaintiffs were stymied in their efforts to fairly conduct these depositions by the conduct of counsel for the Defendants.

10. This conduct included making repeated speaking objections and coaching witnesses through his objections.

11. Aside from the fact that these objections in many instances may have influenced the testimony of the witness, these unnecessary and inappropriate objections have prejudiced the Plaintiffs due to Plaintiffs' use of a videographer to record the depositions.

12. One of the primary purposes of taking a audiovisual record of these depositions is for use at trial. Because of the extensive and unnecessary objections and remarks by counsel for the Defendants during these depositions, the effectiveness of Plaintiffs' videotaped depositions at trial has been significantly diminished.

13. As inappropriate as these instances of speaking objections and coaching were during these depositions, counsel for Defendants has engaged in even more egregious conduct at the depositions by his completely inappropriate instructions not to answer questions posed by counsel for Plaintiffs.

14. Indeed, despite the fact that counsel for Defendants gave instructions not to answer questions a total of *fifty-seven (57) times*. And, as discussed below, this number is this low only because, after giving several instructions to Ms. DeMiere not to answer questions posed by counsel for Plaintiffs, counsel for Defendants ultimately stipulated that they would object to any of the questions that Defendant Poleski had been instructed not to answer if they were posed

to Ms. DeMiere.

15.     Many of the instructions not to answer questions which counsel for Defendants issued to Defendants Graham and Poleski and Ms. DeMiere were issued because counsel for Defendants believed that Plaintiffs' questions inappropriately sought medical opinions.

16.     However, as discussed below, these questions were not posed to elicit medical opinions from the deponents but, rather, to determine the extent of their knowledge of the relevant body of medical science so as to help Plaintiffs prove their allegations of deliberate indifference and negligence.

17.     As a result of counsel for Defendants' inappropriate instructions not to answer appropriate questions in violation of the Rules of Civil Procedure, Plaintiffs will be required to reconvene the depositions of Defendants Graham and Poleski as well as Ms. DeMiere at additional expense.

18.     Plaintiffs therefore request that this Honorable Court enter an Order:

(a) directing Defendants to (i) refrain from objections in future depositions other than those that must be made at the time of the deposition pursuant to Rule 32(d)(3); (ii) keep any objections in future depositions as concise as possible as required by Rule 30(c)(2); and (iii) to refrain from instructing deponents not to answer questions except on the three (3) grounds permitted by Rule 30(c)(2);

(b) allowing Plaintiffs to re-depose Defendants Graham and Poleski and Wexford employee Lisa DeMiere to re-ask those questions to which improper objections or instructions not to answer questions were made as well as all questions reasonably related to the deponents' answers; and

(c) require counsel Defendants to pay sanctions to include (i) costs of the court reporter for these re-depositions; (ii) costs of the videographer for these re-depositions, excluding travel costs; (iii) mileage at a reasonable rate for Plaintiffs' counsel's travel to and from Pittsburgh for the depositions; and (iv) fees for the time expended by Plaintiffs' counsel preparing this Motion and re-deposing those three witnesses at counsel's usual and customary rate.

## **B. Legal Standards**.

19.     The Federal Rules of Civil Procedure contemplate the parties making only minimal, necessary objections during depositions, as "the underlying purpose of a deposition is to find out what a witness saw, heard, or did—what the witness thinks." *Hall v. Clifton Precision*, 150 F.R.D. 525, 528 (E.D.Pa. 1993). *See also* 1993 Advisory Committee notes to Fed. R. Civ. P. 30(d) ("While objections may, under the revised rule, be made during a deposition, they ordinarily should be limited to those that under Rule 32(d)(3) might be waived if not made at that time, i.e., objections on grounds that might be immediately obviated, removed, or cured, such as to the form of a question or the responsiveness of an answer.").

20.     The only objections that need to be made during the deposition itself are objections to errors or irregularities which "relat[e] to the manner of taking the deposition, the form of a question or answer, the oath or affirmation, a party's conduct, or other matters that might have been corrected at that time." Fed. R. Civ. P. 32(d)(3).

21.     Objections to the "competence, relevance, or materiality of testimony" are not waived if not made at the deposition "unless the ground for it might have been corrected at that

time." Fed. R. Civ. P. 32(d)(3)(A).

22.     Indeed, except as provided in Rule 32(d)(3),[2] "an objection may be made at a . . .

trial to the admission of any deposition testimony that would be inadmissible if the witness were

present and testifying." Fed. R. Civ. P. 32(b).

23.     In short, the rules are clear that the only objections that need to be raised at the

time of the deposition itself are those objections which could be corrected at the time of the

deposition.

24.      Further, Rule 30(c)(2) is clear that "[a]n objection must be stated concisely in a

nonargumentative and nonsuggestive manner."

25.     Additionally, "[a] person may instruct a deponent not to answer only when

necessary to preserve a privilege, to enforce a limitation ordered by the court, or to present a

motion under Rule 30(d)(3)," and when an objection is made, "the examination still proceeds

[and] the testimony is taken subject to the objection." Fed. R. Civ. P. 30(c)(2).

26.     A deponent's lawyer is not to "act as 'an intermediary interpreting questions,

deciding which questions the witness should answer, and helping the witness to formulate

answers.'" *Applied Telematics v. Sprint Corp.*, No. 94-cv-4603, 1995 U.S. Dist. LEXIS 2191,

*2-3 (E.D.Pa. Feb. 22, 1995) (quoting *Hall*, 150 F.R.D. at 528).

27.     "Nor should counsel repeatedly interrupt the deposition to make objections

regarding 'competency, relevancy, or materiality' since they are preserved for trial;" rather,

"[t]he only proper objections at a deposition are for answers protected by a privilege and to make

objections that would be waived if not raised immediately pursuant to Fed.R.Civ.P. 32(d)(3)(B)."

---

[2] Rule 32(b) is also subject to Rule 28(b); however, Rule 28(b) concerns depositions in foreign countries. Given that the instant depositions have all been taken in Allegheny County, Pennsylvania or Westmoreland County, Pennsylvania, this Rule is inapplicable to the matter at bar.

*Id.* at *3 (quoting *Hall*, 150 F.R.D. at 528 n.3).

28.     Attorneys, therefore, may not engage in "speaking objections" which "occur when the defending attorney actually engaging in coaching the witness, attempting in the course of articulating the objection to direct the witness' attention to what the 'right' or 'correct' answer should be." *Applied Telematics* at *4. Instead, an attorney should simply state "objection to form" so as to put the attorney conducting the deposition on notice "of the ground for the objection, and thereby allow revision of the question." *Id. See also Sec. Nat'l Bank of Sioux City v. Abbott Labs.*, 299 F.R.D. 595, 604 (D.Iowa 2004) (noting that Fed. R. Civ. P. 30(c)(2) "mandates what should already be obvious—lawyers may not comment on questions in any way that might affect the witness's answer.").

29.     Inappropriate objections can take several forms, including "'clarification-inducing' objections," such as that questions are vague, called for speculation, or are hypothetical, that induce witnesses to seek clarification. *Abbott Labs.*, 299 F.R.D. at 604.

30.     Additionally, an "attorney may not object to a question that the attorney does not understand." *Applied Telematics* at *6. *See also Abbott Labs.*, 299 F.R.D. at 605 ("The witness—not the lawyer—gets to decide whether he or she understands a particular question.").

31.     Similarly, it is inappropriate for a defending attorney to instruct his client to "answer if you know" or to not guess. *Abbott Labs.*, 299 F.R.D. at 606-07. *See also Cincinnati Ins. Co. v. Serrano*, No. 11-2075-JAR, 2012 U.S. Dist. LEXIS 1363, *12 (D. Kan. Jan. 5, 2012) (noting that "[i]nstructions to a witness that they may answer a question 'if they know' or 'if they understand the question' are raw, unmitigated coaching, and are never appropriate" and that such conduct "is misconduct and sanctionable.").

32.     Additionally, excessive and unnecessary interruptions constitute grounds for sanctions under the Federal Rules of Civil Procedure. *Abbott Labs.*, 299 F.R.D. at 609 (citing 1993 Advisory Committee comments to Fed. R. Civ. P. 30).

33.     The imposition of sanctions under Rule 30(d)(2) does not require a finding of bad faith; rather, the person sanctioned need only have impeded, delayed, or frustrated the fair examination of the deponent. *Abbott Labs.*, 299 F.R.D. at 599-600 (quoting *GMAC Bank v. HTFC Corp.*, 248 F.R.D. 182, 196 (E.D. Pa. 2008); Fed. R. Civ. P. 30(d)(2).

### C. Counsel's Inappropriate Speaking Objections, Coaching of Witnesses, and Other Impermissible Objections.

34.     Throughout the depositions of Defendants Graham and Poleski and Ms. DeMiere, [3] counsel for Defendants made a significant number of speaking objections that not only constituted coaching the witness but also excessively interrupted the deposition so as to disrupt counsel's questioning of the witnesses.

35.     Most egregiously, during Defendant Graham's deposition, counsel for Defendants *repeatedly* suggested answers for questions posed to the deponent:

Q. So would it be fair to say that you didn't do a differential diagnosis?

A. I didn't document a differential diagnosis.

Q. Okay. You didn't document a differential diagnosis. Even though you didn't document it, tell me what it was.

MR. FOREMAN: Pregnancy maybe.

A. Yes, the pregnancy or the differential diagnosis would have been pregnancy

---

[3] A complete copy of the transcript of Defendant Graham's deposition is attached hereto as Exhibit 1. Plaintiffs have obtained draft copies of the deposition transcripts of Defendant Poleski and Ms. DeMiere, which are attached hereto as Exhibits 2 and 3; however, the court reporter has not yet revised and completed final versions of these transcripts. It is therefore important to note that both the transcripts of Poleski and DeMiere are not certified, final transcripts of those depositions.

without fetal movement.

(Ex. 1, Graham Dep., at 123:2-11).

Q. And so where did you go in April 2012?

A. I went to work with a group of physical medicine doctors and chiropractors.

Q. What are physical medicine doctors?

A. Physical medicine doctors are doctors. Let's say you had a stroke or you were in a car accident. They are the doctors that would prescribe therapy for you in a rehabilitation center.

MR. FOREMAN: Physiatrists?

THE WITNESS: Right.

(Ex. 1, Graham Dep., at 25:2-11).

Q. But the earlier you're able to diagnose something, the better chance of an outcome; correct?

MR. FOREMAN: Let me note an objection for the record to this question. I think that while it's not necessarily true, you know, there have been studies that have well demonstrated an early diagnosis of prostate cancer is actually potentially more harmful to a patient than a later one.

So I don't agree with the medical principle you're espousing here, but having objected to this entire line of questioning, I will let the witness attempt to answer it.

A. Yes, that if you have an earlier diagnosis, the chances of you getting the right treatment are probably better so --

(Ex. 1, Graham Dep., at 45:5-16).

Q. Okay. Did you take a history from Ms. Pollitt detailing the quantity of bleeding?

A. Not that I recall. I do remember her saying it was minor.

Q. You didn't write minor down, though, did you?

MR. FOREMAN: Objection.

Q. Did you write minor down?

MR. FOREMAN: He wrote spotting.

A. No, I wrote that there was no current spotting.

(Ex. 1, Graham Dep., at 106:2-13).

36.     In at least one instance, counsel ***directly answered a question for Mr. Graham***:

Q. Did you know at the time you were caring for her what her dosage was?

A. Probably -- no.

Q. Why did you first say probably?

MR. FOREMAN: Objection.

THE WITNESS: Yes.

MR. FOREMAN: He was about to say probably not and he changed his answer to no. He was not about to say probably.

THE WITNESS: That's correct.

(Ex. 1, Graham Dep., at 67:14-23).

37.     This blatant coaching continued into the depositions of Defendant Poleski and Ms. DeMiere. (*See, e.g.,* Appx. A. at No. 18, 19, 20). Plaintiffs have reproduced a number of the coaching and speaking objections by counsel for Defendants in Appendix A[4] hereto, though this Appendix is not intended to be an exhaustive compendium of all inappropriate objections by counsel for Defendants during this litigation.

38.     In a number of other cases, counsel for the Defendants suggested to the witness that the witness needed to be sure to answer the question within the scope of his expertise. (*See, e.g.,* Appx. A at Nos. 3, 8, 14, 22, 23, 24, & 34).

39.     In one of these cases, the deponent obviously picked up the suggestion of counsel in answering the question:

Q. When should a woman who is expecting be evaluated for signs and symptoms of preterm labor?

---

[4] For ease of reference, citations to Appendix A refer to the number assigned therein to each "Improper Objection."

MR. FOREMAN: Objection. To the extent you're asking him a question --

MR. MIZNER: I'm just asking him based upon his experience.

MR. FOREMAN: -- based upon his experience *as a nurse practitioner*. Okay. He may answer that question.

MR. MIZNER: Yes.

A. *I feel that that's outside of my scope of practice*, yeah. I don't know.

(Ex. 1, Graham Dep., at 69:17-70:3) (emphasis added).

40. Counsel for Defendants also repeatedly made objections based upon the fact that counsel—not the witness—did not understand a question or found it ambiguous. (*See, e.g.,* Appx. A at 10, 11, 15, 17, & 32).

41. Again, in several instances, the deponent picked up on the suggestion made by counsel:

Q. Were you ever a decision maker with respect to Ms. Pollitt's care?

MR. FOREMAN: I'm going to object to the extent that *that's ambiguous*.

A. *I don't understand the question*.

(Ex. 3, DeMiere Dep. at 27:9-13) (emphasis added).

Q, And that a registered nurse should be able to document expected outcomes, correct?

MR. FOREMAN: I am going to object to that question, as *I don't understand it*.

A. *Can you rephrase that*?

(Ex. 3, DeMiere Dep. at 29:4-8) (emphasis added).

Q. How are they done today, the care plans? If they are not written out, how are they memorialized?

MR. FOREMAN: I'm going to object to relevancy. You can attempt to answer the question.

A. You got me confused now.

Q. What has you confused?

A. Your question. Can you rephrase the question.

MR. MIZNER: Read it back. And you need to tell me which part of the question you don't understand. I'll be happy to explain.

THE WITNESS: Okay.

MR. FOREMAN: How about these *vague, abstract questions that have no application to anything in the case or real life* and no definable terms? How about that? But please proceed.

(Question read.)

A. Okay. *In what situation? What place of work are you talking about?*

(Ex. 3, DeMiere Dep. at 32:8-25) (emphasis added).

42.     Counsel for Defendants also gave repeated instructions to the effect that the witness was not required to "approximate" and the witness should answer only "to the best of [the witness's] recollection," as well as repeatedly telling the witness she need not answer if she could not remember while a question was pending. (*See, e.g.,* Appx. A at 26, Nos. 27, 28, & 29).

43.     In a handful of instances, counsel for Defendants made objections that were simply rude, such as objections to questions as "stupid" or "asinine," an objection that he did not know what counsel's point was, and an objection that Plaintiffs were posing "vague, abstract questions that have no application to anything in the case or real life" (*See, e.g.,* Appx. A at Nos. 12, 21, 33; Appx. B at No. 1).

44.     And, as discussed in greater detail below, counsel for Defendants repeatedly objected to questions as asking for a medical or even a legal opinion. (*See, e.g.,* Appx. A at Nos. 14, 15, 16, 22, 23, 24, 25, & 31).

45.     The net effect of these inappropriate objections was to defeat the purpose of the deposition as identified by the court in the *Hall* case: "to find out what a witness saw, heard, or

did—what the witness thinks." *Hall*, 150 F.R.D. at 528 (E.D.Pa. 1993).

46.     Most of these objections appeared to at least be intended to convey information to the witness about how to answer a question. And, the presence of all of these questions significantly decreases the value of the depositions to Plaintiffs.

47.     Further, the frequent objections of counsel for the Defendants "frustrated the free flow of the depositions," *Abbott Labs.*, 299 F.R.D. at 606, as evidenced by the fact that these questions often caused confusion about what question had been asked or prompted the witness to request clarification of the question. (*See, e.g.,* Appx. A at Nos. 9, 12, 14, 16, 22, 32, 33).

48.     As discussed above, Plaintiffs have videotaped each of these depositions for the purpose of using this testimony at trial.

49.     The frequent objections and interjections from counsel for Defendants have significantly decreased the value of these videotaped depositions to Plaintiffs for use at trial, as it will be much more difficult for a jury to follow the testimony on videotape given the often lengthy objections from counsel for Defendants.

50.     The conduct of counsel for Defendants manifestly violates the Federal Rules of Civil Procedure. Specifically, the copious, unduly lengthy, and unnecessary objections by counsel violates the letter of Rule 30(c)(2) that "[a]n objection must be stated concisely in a nonargumentative and nonsuggestive manner" as well as the spirit of Rule 30(d) which, the 1993 Advisory Committee note explains, was intended to be used only to make those objections that may be waived because they are based upon grounds that "might be immediately obviated, removed, or cured, such as to the form of a question or the responsiveness of an answer.

51.     This conduct is sanctionable by this Honorable Court. Fed. R. Civ. P. 30(d)(2)

("The court may impose an appropriate sanction--including the reasonable expenses and attorney's fees incurred by any party--on a person who impedes, delays, or frustrates the fair examination of the deponent.").

**D. Counsel's Inappropriate Instructions Not to Answer Questions.**

52.     Beginning in Mr. Graham's deposition, counsel for Defendants also began giving witnesses instructions not to answer questions when counsel for Defendants felt that the questions were seeking "medical opinion":

> Q. Would you agree that immediate assessment and diagnosis to determine the cause of bleeding is essentially to reduce the risk of maternal morbidity and mortality?
>
> MR. FOREMAN: That is a very much medical opinion question. I'm going to direct him not to answer that question. I think it calls for an expert opinion.

(Ex. 1, Graham Dep., at 116:7-14).

> Q. And can we agree nurse practitioners should use history and physical findings and diagnostic studies to formulate a differential diagnosis?
>
> A. Say that again.
>
> MR. MIZNER: Please read it.
>
> (Question read.)
>
> MR. FOREMAN: I'm going to object to the question. I think you're asking him for an expert opinion, and I'm going to direct him not to answer that question.

(Ex. 1, Graham Dep., at 124:22-125:6).

> Q. Do you ever make mistakes?
>
> MR. FOREMAN: Objection. Do not answer that question.
>
> THE WITNESS: Okay.
>
> MR. FOREMAN: It is argumentative, besides potentially asking for expert testimony.

(Ex. 1, Graham Dep., at 143:2-7).

53.     During Defendant Poleski's deposition, counsel for Defendants again began to object to questions posed to Defendant Poleski about his medical knowledge on the grounds that they sought "expert opinion," though counsel initially allowed Defendant Poleski to answer these questions. (*See* Ex. 2, Poleski Dep., at 47:15-19, 48:12-23).

54.     After making several of these objections, counsel for Defendant became "fed up" with Plaintiffs' questions and began again instructing his client not to answer questions:

Q. Do you know what the potential causes of abdominal pain are in the third trimester?

A. There is multiple answers for that.

MR. FOREMAN: Same objection.

BY MR. MIZNER:

Q. And what are they?

A. Baby kicking.

Q. What else?

A. I don't know. There is too many to list.

Q. Tell me the ones you know.

MR. FOREMAN: You basically have asked him, then, so I'm clear, the potential causes of abdominal pain?

MR. MIZNER: For a woman in her third trimester that he knows.

MR. FOREMAN: For anybody, then, because a person in the third trimester could have the same abdominal pain as somebody who is not pregnant could have, right?

MR. MIZNER: Please state your objection.

MR. FOREMAN: I'm trying to help you with your question, which you seem to have difficulty asking.

MR. MIZNER: I've asked the question and either he can answer or you can direct

him not to answer.

MR. FOREMAN: All right. ***I'm directing him not to answer. I'm just fed up with you asking medical causation opinions of these L.P.N.s***. I've given you substantial license to do it that I don't think I necessarily should have given. Let's move on. Why don't you ask him your further questions.

(Ex. 2, Poleski Dep., at 48:12-50:7) (emphasis added).

55.     During the course of Defendant Poleski's deposition, his counsel instructed him not to answer a question on ***forty-five (45) different occasions***. Each of these 45 instructions not to answer is reproduced in Appendix B hereto.

56.     The reasons given for these instructions not to answer included that counsel for Defendants believed that certain questions sought "medical opinion" or "expert opinion," (*see, e.g.,* Appx. B at Nos. 1, 2, 11, 20, 22, 23, 30, 37, 42, 44 & 45); asked the witness to provide a "diagnosis," (*see, e.g.,* Appx. B at Nos. 34 & 35); were "argumentative," (*see, e.g.,* Appx. B at Nos. 36, 38 & 40); were not "polite," (Appx. B at No. 39); and concerned a "document [that] speaks for itself," (Appx. B at No. 41).

57.     Many times, no reason was given for instructing the deponent not to answer. (*See, e.g.,* Appx. B at Nos. 3, 4, 5, 7, 8, 10, 12, 13, 14, 15, 16, 17, 18, 21, 24, 25, 26, 27, 28, 29, 31, & 32).

58.     Similarly, during the deposition of Lisa DeMiere, counsel for Defendants instructed the witness not to answer questions on nine (9) occasions. (Appx. C).

59.     The number of instructions not to answer during Ms. DeMiere's deposition was lower than during Defendant Poleski's deposition only because counsel for Defendants ***stipulated that he would object to all of the questions he refused to allow Defendant Poleski to answer***:

BY MR. MIZNER:

Q. Is abdominal pain in the third trimester cause for concern for an expecting mother?

MR. FOREMAN: Same objection. If you want to stipulate -- I will stipulate that you asked her all the questions that you asked Ed Poleski that I objected to all of the same, unless you want to go through and read them all.

MR. MIZNER: No, I will accept that objection and I will incorporate it in by reference.

Is that all right with you, Counsel?

MS. McPEAK: That is Fine with me.

MR. FOREMAN: I will spot you that you wanted to ask those questions of her and that I will have objected to them. That doesn't mean that we won't run across one yet that I won't have that objection to, but at least we're happy.

(Ex. 3, DeMiere Dep. at 47:13-48:4).

60.     Pursuant to Fed. R. Civ. P. 30(c)(2), "[a] person may instruct a deponent not to answer only when necessary to preserve a privilege, to enforce a limitation ordered by the court, or to present a motion under Rule 30(d)(3)."

61.     *None* of the questions to which Mr. Foreman directed his client not to respond were made to preserve a privilege, to enforce a limitation order by this Honorable Court, or to present a motion to terminate or limit the deposition under Rule 30(d)(3).

62.     Further, under Fed.R.Civ.P. 32(b) & (d)(3), any objections to testimony based upon the grounds that the testimony may constitute an inadmissible expert opinion need not be made (and, as the 1993 Advisory Committee note to Rule 30(d) explains, should not be made) at the time of the deposition in order to preserve such objections for trial.

63.     And, even if it were permissible to not only object to testimony on the grounds that it constitutes "opinion" evidence during a deposition but to also instruct the witness not to

answer such questions, the questions counsel asked of the deponents ***did not seek expert opinion testimony***.

64.     Under the Rules of Evidence, expert opinion must ask a deponent, based on a hypothetical, for an answer to a "'reasonable degree of scientific or technical certainty.'" *Applied Telematics*, 1995 U.S. Dist. LEXIS 2191 at *9 (citing Fed.R.Evid. 702; *Lanza v. Poretti*, 537 F. Supp. 777, 785-86 (E.D.Pa. 1982)). *See also Keating v. Coatesville VA Med. Ctr. (Estate of Keating)*, 498 Fed. Appx. 181, 184 (3d Cir. 2012) (noting that recovery in a medical malpractice claim founded on a Pennsylvania state law negligence theory requires, as an element of proof, "'an expert witness who will testify, ***to a reasonable degree of medical certainty***, that the acts of the physician deviated from good and acceptable medical standards, and that such deviation was the proximate cause of the harm suffered.'") (quoting *Mitzelfelt v. Kamrin*, 526 Pa. 54, 584 A.2d 888, 892 (1990) (emphasis added)).

65.     Here, because the questions posed to the witnesses did not ask them to render an opinion to a reasonable degree of medical certainty based upon a hypothetical, these questions did not seek expert opinions and they were proper deposition questions. *See Applied Telematics*, 1995 U.S. Dist. LEXIS 2191 at *9-10 (holding that questions that were not put to a lay witness seeking an answer within "'a reasonable degree of scientific certainty'" were proper deposition questions).

66.     Further, counsel for Plaintiffs was clear that his questions sought information about the ***deponents' own personal medical knowledge*** rather than opinion questions asking for abstract medical principles to be applied to the facts of the case.

67.     At the beginning of each deposition, counsel for Plaintiffs has explained that the

deponent is only to answer questions to which the deponent knows the answer and, if the deponent does not know an answer, the deponent should simply say "I don't know." (*See, e.g.,* Ex. 1, Graham Dep., at 5:13-23; Ex. 3, DeMiere Dep. at 7:15-8:2; Ex. 2, Poleski Dep., at 6:10-22).

68.     Further, throughout the questions which counsel for Defendants instructed his clients not to answer, counsel for Plaintiffs were clear that Plaintiffs were seeking only information about the deponents' personal knowledge of relevant medical issues:

Q. ***Do you know*** what the potential causes of abdominal pain are in the third trimester?

A. There is multiple answers for that.

MR. FOREMAN: Same objection.

BY MR. MIZNER:

Q. And what are they?

A. Baby kicking.

Q. What else?

A. I don't know. There is too many to list.

Q. ***Tell me the ones you know.***

MR. FOREMAN: You basically have asked him, then, so I'm clear, the potential causes of abdominal pain?

MR. MIZNER: For a woman in her third trimester ***that he knows***.

MR. FOREMAN: For anybody, then, because a person in the third trimester could have the same abdominal pain as somebody who is not pregnant could have, right?

MR. MIZNER: Please state your objection.

MR. FOREMAN: I'm trying to help you with your question, which you seem to have difficulty asking.

MR. MIZNER: I've asked the question and either he can answer or you can direct

him not to answer.

MR. FOREMAN: All right. I'm directing him not to answer. I'm just fed up with you asking medical causation opinions of these L.P.N.s. I've given you substantial license to do it that I don't think I necessarily should have given. Let's move on. Why don't you ask him your further questions.

(Ex. 2, Poleski Dep., at 48:12-50:7).

Q. Is lower back pain in conjunction with abdominal pain cause for concern in a woman in her third trimester?

MR. FOREMAN: Objection. Don't answer that question. It's a medical opinion question.

MR. MIZNER: ***I'm just asking what you know, sir***.

MR. FOREMAN: And I'm telling him not to answer it.

(Ex. 2, Poleski Dep., at 50:8-17) (emphasis added).

BY MR. MIZNER:

Q. ***Do you know*** what common causes of bleeding in the third trimester are?

MR. FOREMAN: Same objection. Do not answer.

(Ex. 2, Poleski Dep., at 51:19-23) (emphasis added).

Q. ***Do you know*** what any of the symptoms are of placenta abruption?

MR. FOREMAN: Same objection, same instruction.

MR. MIZNER: That's not to answer?

MR. FOREMAN: I'm instructing him not to answer the question.

(Ex. 2, Poleski Dep., at 52:22-53:4) (emphasis added).

BY MR. MIZNER:

Q. ***Do you know*** how to diagnose or how placenta abruption is diagnosed?

MR. FOREMAN: Same objection, same instruction. It's a medical opinion.

(Ex. 2, Poleski Dep., at 53:5-9).


BY MR. MIZNER:

Q. ***Do you know*** how placenta abruption is treated?

MR. FOREMAN: Same objection, same instruction.

(Ex. 2, Poleski Dep., at 53:10-13).


BY MR. MIZNER:

Q. ***Do you know*** whether there is a standard assessment for third-term bleeding?

MR. FOREMAN: Same objection. Do not answer.

(Ex. 2, Poleski Dep., at 53:14-18).


BY MR. MIZNER:

Q. ***Do you*** ***know*** whether there is any standard interventions for a patient with bleeding or spotting in the third trimester?

MR. FOREMAN: Same objection. Do not answer.

(Ex. 2, Poleski Dep., at 53:24-54:4).


BY MR. MIZNER:

Q. ***Do you*** ***know*** what the appropriate response for a mother -- expectant mother suffering from cramping in the third trimester is?

MR. FOREMAN: Appropriate what, medical response?

MR. MIZNER: The appropriate medical response.

MR. FOREMAN: Same objection. Do not answer.

(Ex. 2, Poleski Dep., at 54:16-24).

BY MR. MIZNER:

Q. ***Can you provide me*** any symptoms of Braxton Hicks contractions?

MR. FOREMAN: Same objection, same instruction.

(Ex. 2, Poleski Dep., at 55:23-56:2).


Q. ***Do you*** ***know***, is there a standard assessment that should be performed when a woman reports cramping?

A. Is there a standard assessment?

Q. Yes.

MR. FOREMAN: Objection. That calls for a medical opinion. I'm instructing him not to answer the question.

(Ex. 2, Poleski Dep., at 58:6-12).


Q. ***Do you know*** what the symptoms of preterm labor are?

MR. FOREMAN: Same objection, same instruction.

(Ex. 2, Poleski Dep., at 61:1-4).


BY MR. MIZNER:

Q. ***Do you*** ***know*** whether there is any test or procedures to diagnose preterm labor?

MR. FOREMAN: Same objection, same instruction.

(Ex. 2, Poleski Dep., at 61:5-9).


BY MR. MIZNER:

Q. ***Do you know*** how preterm labor is treated?

MR. FOREMAN: Same objection, same instruction.

(Ex. 2, Poleski Dep., at 61:10-13).

BY MR. MIZNER:

Q. ***Do you know*** what the proper treatment is for abruption placenta?

MR. FOREMAN: Same objection, same instruction.

(Ex. 2, Poleski Dep., at 61:18-22).


BY MR. MIZNER:

Q. ***Do you know*** whether there is any test or analysis that can be done to determine whether a mother is suffering from placenta abruption?

MR. FOREMAN: Same objection. Do not answer the question.

(Ex. 2, Poleski Dep., at 61:23-62:3).


BY MR. MIZNER:

Q. ***Do you know***, is there an objective, evidence-based standard for manually palpating for fetal movement?

MR. FOREMAN: Same objection. Do not answer that question.

(Ex. 2, Poleski Dep., at 65:1-6).


Q. And given all the information now that you had about abdominal pain and spotting and lower back pain and now cramping, ***what was your understanding*** after you reviewed this information as to what the potential causes of those symptoms could be?

MR. FOREMAN: I'm going to object and instruct him not to answer that question. You're asking him to make a medical diagnosis.

MR. MIZNER: No, I'm not. ***I'm asking his thought process after he has read this information***.

MR. FOREMAN: His thought process is relevant and competent only to the extent that it is as a licensed practical nurse. If you're asking him to render a diagnosis, then my objection stands, but I will allow him to attempt to answer the question.

A. I couldn't tell you what I was thinking at the time.

(Ex. 2, Poleski Dep., at 103:10-104:1).


Q. ***Do*** ***you*** ***have*** ***any*** ***reason*** ***to*** ***believe*** that her prior use of drugs played any role in what occurred to her between August 3rd and August 9th at the Westmoreland County Prison?

MR. FOREMAN: Again, for the sake of consistency, I do not believe I can allow him to answer that question. It's a question of medical causation and opinion; therefore, I'm instructing him not to answer it.

(Ex. 2, Poleski Dep., at 124:6-14).


Q. ***Were*** ***you*** ***ever*** ***concerned*** that your colleagues were not qualified to assess or to treat Ms. Pollitt's condition?

MR. FOREMAN: I'm going to have to object to that question on the grounds that it potentially has him render expert testimony potentially against a codefendant, and besides being irrelevant, I have to instruct him not to answer the question.

(Ex. 2, Poleski Dep., at 128:15-22).


Q. ***Did*** ***you*** ***ever*** ***have*** ***any*** ***concern*** that the Westmoreland County Prison lacked the proper facilities and equipment to monitor and to take care of a pregnant mother and her baby child?

MR. FOREMAN: Again, I don't think that that is an appropriate question to ask this witness. I think it calls for expert opinion testimony and I'm going to have to instruct him not to answer the question.

(Ex. 2, Poleski Dep., at 128:23-129:7).


Q. ***Are*** ***you*** ***aware*** of any other reliable indicators of a baby's health and wellbeing?

A. I'm not sure I understand that.

MR. FOREMAN: Well, I think you're getting into asking her a question that calls for medical expertise, so I'm going to instruct her not to answer that question.

(Ex. 3, DeMiere Dep. at 46:25-47:6).

> Q. ***Do you know*** whether a mother's vital signs tell you or are an indicator of the baby's vital signs?
>
> MR. FOREMAN: Note my objection that you're asking her for a medical opinion and I'm instructing her not to answer the question.

(Ex. 3, DeMiere Dep. at 62:11-15).

69.     These repeated references to seeking only information about what the deponent knew, combined with the instructions given at the beginning of each deposition, are more than enough to put the deponents on notice that Plaintiffs were seeking information about what they ***knew*** rather than attempting to elicit medical opinion testimony from these deponents.

70.     In their Amended Complaint, Plaintiffs clearly explained that part of their theory of the case is that the Defendants were negligent and deliberately indifferent to Ms. Pollitt's and baby Brian Camp, Jr.'s condition because, despite lacking the necessary expertise in obstetrics, they failed to have Ms. Pollitt examined by a competent obstetrician. (*See, e.g.,* Doc. 45 at ¶¶ 40, 42, 43, 46-52, 55, 102, 106, 110).

71.     In order to prove their theory of the case, Plaintiffs are entitled to explore the extent of the individual Defendants' knowledge of various medical concepts which are relevant to Ms. Pollitt's condition in July and August 2012 to demonstrate that these Defendants were so ill-equipped to treat Ms. Pollitt and her baby boy at the prison that they needed to immediately take her to receive appropriate obstetrical care.

72.     By objecting to legitimate attempts to garner this information as seeking "expert opinion" and instructing deponents not to answer these questions, counsel for Defendants has not

allowed Plaintiffs to fairly explore their theories of the case.

73.     The absurdity of the position taken by Defendants can be seen through a careful examination of Defendant Poleski's testimony.

74.     During Mr. Poleski's deposition, counsel for Plaintiffs asked him a question about manually palpating for fetal movement, which Mr. Poleski was instructed not to answer by his counsel:

> BY MR. MIZNER:
>
> Q. Do you know, is there an objective, evidence-based standard for manually palpating for fetal movement?
>
> MR. FOREMAN: Same objection. Do not answer that question.

(Ex. 2, Poleski Dep., at 65:1-6).

75.     However, immediately thereafter, counsel for Plaintiffs asked Defendant Poleski whether he had manually palpated Ms. Pollitt's abdomen to feel for fetal movement, and he responded that he had.[5] (Ex. 2, Poleski Dep., at 65:8-19).

76.     It is therefore likely that Defendant Poleski will argue that his alleged palpation of Ms. Pollitt's stomach was part of the "care" that he provided to her in an attempt to defeat Ms. Pollitt's deliberate indifference and medical malpractice claims.

77.     Yet, because of counsel for Defendants, Plaintiffs were unable to ask Defendant Poleski whether there he was aware of any standard for performing such palpation.

78.     As a result, Defendant Poleski has the ability to articulate a rationale for his alleged palpation of Ms. Pollitt's abdomen at trial without Plaintiffs having the opportunity to research, study, and evaluate whether his rationale is appropriate or conforms to the applicable

---

[5] Despite Defendant Poleski's testimony that manually palpating a pregnant woman's stomach should be put in that woman's chart, (Ex. 2, Poleski Dep., at 65:20-66:2), there is no entry in Ms. Pollitt's medical records reflecting that Defendant Poleski ever palpated her stomach.

standard of care.

79.     Indeed, all of the instructions not to answer given by counsel for Defendants have similar effects of preventing the Plaintiffs from conducting legitimate discovery to learn potential defenses the Defendants may believe they have and addressing those potential defenses.

80.     When counsel inappropriately instructs a deponent not to answer valid questions seeking discoverable evidence, it is proper to impose sanctions against that counsel. Fed. R. Civ. P. 37(a)(5) provides:

> (5) Payment of Expenses; Protective Orders.
>
> > (A) If the Motion Is Granted (or Disclosure or Discovery Is Provided After Filing). If the motion is granted--or if the disclosure or requested discovery is provided after the motion was filed--the court must, after giving an opportunity to be heard, require the party or deponent whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees. But the court must not order this payment if:
> >
> > > (i) the movant filed the motion before attempting in good faith to obtain the disclosure or discovery without court action;
> > >
> > > (ii) the opposing party's nondisclosure, response, or objection was substantially justified; or
> > >
> > > (iii) other circumstances make an award of expenses unjust.

*See also Thornton v. UL Enters., LLC*, No. 09-287E, 2011 U.S. Dist. LEXIS 41149, *8 (W.D.Pa. Apr. 14, 2011) (allowing a plaintiff to re-depose a witness where defendant counsel had improperly instructed the witness not to answer questions on the grounds of relevance and allowing the plaintiff to recover reasonable costs associated with the follow-up deposition).

81.     Here, the conduct of counsel for Defendant does not include isolated instances of erroneous instructions not to answer questions during a deposition. Rather, counsel for

Defendant has engaged in a pattern of conduct intended and calculated to disrupt Plaintiffs' questioning—questioning that goes directly to the heart of Plaintiffs' theory of the case against Defendants.

82.     As a result, sanctions in the form of requiring Defendants Poleski and Graham as well as Ms. DeMiere to be re-deposed by Plaintiffs as well as requiring counsel for Defendants to pay the reasonable costs of such re-deposition are warranted in this matter.

**E. Relief Requested**.

83.     The inappropriate conduct of counsel for Defendants during these depositions must end if Plaintiffs are to be able to fairly conduct depositions in this matter.

84.     As such, Plaintiffs ask that this Honorable Court enter an Order directing Defendants (a) to refrain from objections in future depositions other than those that must be made at the time of the deposition pursuant to Rule 32(d)(3); (b) to keep any objections in future depositions as concise as possible as required by Rule 30(c)(2); and (c) to refrain from instructing deponents not to answer questions except on the three (3) grounds permitted by Rule 30(c)(2).

85.     In order to remedy the harm counsel for the Defendants has caused, Plaintiffs ask that this Honorable Court (a) allow Plaintiffs to re-depose Defendants Graham and Poleski and Wexford employee Lisa DeMiere to re-ask those questions to which improper objections or instructions not to answer questions were made as well as all questions reasonably related to the deponents' answers; and (b) require counsel Defendants to pay sanctions to include (i) costs of the court reporter for these re-depositions; (ii) costs of the videographer for these re-depositions,

excluding travel costs; (iii) mileage at a reasonable rate for Plaintiffs' counsel's travel to and from Pittsburgh for the depositions; and (iv) fees for the time expended by Plaintiffs' counsel preparing this Motion and re-deposing those three witnesses at counsel's usual and customary rate.

WHEREFORE, Plaintiffs Tiffany L. Pollitt and Brian Camp, Sr. respectfully request that this Honorable Court grant their Motion to Compel Adherence to Fed. R. Civ. P. 30, to Allow Re-Depositions to Cure Improper Deposition Conduct, and for Sanctions and enter an Order:

(a) directing Defendants to (i) refrain from objections in future depositions other than those that must be made at the time of the deposition pursuant to Rule 32(d)(3); (ii) keep any objections in future depositions as concise as possible as required by Rule 30(c)(2); and (iii) to refrain from instructing deponents not to answer questions except on the three (3) grounds permitted by Rule 30(c)(2);

(b) allowing Plaintiffs to re-depose Defendants Graham and Poleski and Wexford employee Lisa DeMiere to re-ask those questions to which improper objections or instructions not to answer questions were made as well as all questions reasonably related to the deponents' answers; and

(c) require counsel Defendants to pay sanctions to include (i) costs of the court reporter for these re-depositions; (ii) costs of the videographer for these re-depositions, excluding travel costs; (iii) mileage at a reasonable rate for Plaintiffs' counsel's travel to and from Pittsburgh for the depositions; and (iv) fees for the time expended by Plaintiffs' counsel preparing this Motion and re-deposing those three witnesses at counsel's usual and customary rate.

Respectfully submitted,

MIZNER LAW FIRM

By: /s/ John F. Mizner

John F. Mizner
PA Bar No. 53323
jfm@miznerfirm.com

Joseph M. Kanfer
PA Bar No. 306558
jmk@miznerfirm.com

201 German Street
Erie, Pennsylvania 16507
814.454.3889

*Attorneys for the Plaintiffs*